IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

MARVIN BENISON,         )
         )
    Plaintiff,      )
         )
v.         )   CIVIL ACTION NO. 16-0529-MU
         )
NANCY A. BERRYHILL,   )
Acting Commissioner of Social  )
Security,       )
         )
    Defendant.   )

## MEMORANDUM OPINION AND ORDER

Plaintiff Marvin Benison brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act") and for Supplemental Security Income ("SSI"), based on disability, under Title XVI of the Act. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Doc. 21 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed. R. Civ. P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, … order the entry of a final judgment, and conduct all post-judgment proceedings.")). Upon consideration of the administrative record, Benison's brief, and the Commissioner's brief,[1] it is

_____

[1] The parties waived oral argument in this case. (Docs. 26, 27).

determined that the Commissioner's decision denying benefits should be affirmed.[2]

# I. PROCEDURAL HISTORY

Benison applied for DIB, under Title II of the Act, 42 U.S.C. §§ 423 - 425, and for SSI, based on disability, under Title XVI of the Act, 42 U.S.C. §§ 1381-1383d, on September 19, 2011, alleging disability beginning on September 13, 2011. (Tr. 275, 279). His application was denied at the initial level of administrative review on December 14, 2011. (Tr. 171-75). On January 19, 2012, Benison requested a hearing by an Administrative Law Judge (ALJ). (Tr. 82). After a hearing was held on January 29, 2013, the ALJ issued an unfavorable decision finding that Benison was not under a disability from the date the application was filed through the date of the decision, March 27, 2013. (Tr. 97-114, 142-57). Benison appealed the ALJ's decision to the Appeals Council, and, on May 16, 2014, the Appeals Council remanded his claim for further consideration by the ALJ. (Tr. 226, 158-62). A second hearing was held before an ALJ on December 23, 2014. (Tr. 54-95). On March 23, 2015, Benison's claim was again denied by the ALJ on the basis that he was not disabled under the Act. (Tr. 26-53). Benison again requested that the Appeals Council review the ALJ's decision. (Tr. 22-25). The Appeals Council denied his request for review of

---

[2] Any appeal taken from this Order and Judgment shall be made to the Eleventh Circuit Court of Appeals. *See* Doc. 30. ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for the judicial circuit in the same manner as an appeal from any other judgment of this district court.").

the ALJ's decision on August 24, 2016, thereby making the ALJ's decision the final decision of the Commissioner. (Tr. 2-5).

After exhausting his administrative remedies, Benison sought judicial review in this Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Doc. 1). The Commissioner filed an answer and the social security transcript on February 1, 2017. (Docs. 11, 12). Both parties filed briefs setting forth their respective positions and waived oral argument. (Docs. 14, 25, 26). The case is now ripe for decision.

## II.  CLAIMS ON APPEAL

Benison alleges that the ALJ's decision to deny him benefits is in error for the following reasons:

1. The ALJ erred in rejecting the opinions of Dr. Timberlake, one of the treating physicians, and Dr. Emig, a treating neurologist; and

2. The ALJ erred in failing to indicate the weight given to the opinions of Dr. Goff, a consulting psychologist, and Dr. Todorov, a treating neurologist.

(Doc. 14 at p. 2).

## III. BACKGROUND FACTS

Benison was born on February 23, 1979, and was 32 years old at the time he filed his claim for benefits. (Tr. 116). Benison alleged disability due to a seizure disorder and adjustment disorder with depressed mood. (Tr. 61, 116). He graduated from high school after taking regular classes. (Tr. 63-64, 77). After high school, he attended Shelton State Community College and obtained a certification as a diesel mechanic. (Tr. 64). He has worked as a diesel mechanic,

a shingle packer, and a grocery store cashier and stocker. (Tr. 64, 79, 90).
Benison last worked on March 23, 2011. (Tr. 326). Benison engages in normal
life activities such as handling his personal care, making sandwiches, going out
for a walk, sometimes helping with household chores, shopping in stores,
reading, watching TV, socializing with family and friends, and attending church
and sports events with his wife and step child. (Tr. 66-67, 347-50, 378-82). He
enjoys riding a four-wheeler. (Tr. 84-85). He is able to pay bills, count change,
handle a savings account, and use a checkbook/money order. (Tr. 350). After
conducting a hearing, the ALJ made a determination that Benison had not been
under a disability during the relevant time period, and thus, was not entitled to
benefits. (Tr.16-41).

## IV. ALJ'S DECISION

After considering all of the evidence, the ALJ made the following findings
that are relevant to the issues presented in his March 23, 2015 decision:

> In July 2013, John R. Goff, Ph.D., completed a consultative
> psychological evaluation of the claimant at the request of the
> claimant's Representative (Exhibit 23F). His evaluation included
> psychological assessment with psychometric testing. On the
> WAIS-IV, the claimant scored a 78 in Verbal Comprehension, a
> 77 in Perceptual Reasoning, a 74 in Working Memory, and a 68
> in Processing Speed. His full scale IQ score was 70, and his
> General Ability Index (GAI) was 75.
>
> Dr. Goff noted that both his full scale IQ and his GAI scores were
> borderline scores. He further noted that the processing speed score
> fell within the mildly retarded range and that the other Index scores
> were borderline scores. Dr. Goff opined that the GAI of 75 was the best
> estimate. Dr. Goff also administered the Reitan-Indiana Aphasia
> Screening Test and informal clock drawing tasks, the fourth edition of
> the Wide Range Achievement Test (WRAT-IV), the abbreviated
> version of the third edition of the Wechsler Memory Scale (WMS-III)

supplemented with some additional memory scale items, and the Personality Assessment Inventory (PAI). Dr. Goff administered the WRAT-IV to determine the claimant's academic achievement levels. The claimant obtained standard scores of 86 for Word Reading, 77 for Spelling, and 83 for Math Computation. Dr. Goff noted that the Word Reading score was at the eighth grade level, the Spelling score was at the fifth grade level, and the Math Computation score was at the sixth grade level. He further opined that the Word Reading score might be the best estimate of the claimant's premorbid functioning and that there was a suggestion of a mild decline from previous levels of functioning. Dr. Goff also found that the claimant had some memory skills deficits after formal memory assessment. Dr. Goff diagnosed the claimant with borderline intellectual functioning and cognitive disorder (possible loss associated with seizure disorder) and opined that his borderline intellectual functioning represented an impediment to vocational activity.

The Diagnostic and Statistical Manual of Mental Disorders, fourth edition, text revision (DSM- IV-TR), published by the American Psychiatric Association (APA), clearly specifies that in addition to IQ scores, a diagnosis of intellectual disability must be supported by concurrent deficits or impairments in adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (DSM-IV-TR, pg. 49). The fifth edition of the DSM (DSM-5), which was released in May 2013, makes it even more explicit that IQ alone is insufficient to establish a diagnosis of intellectual disability, and clinicians must examine the individual's overall level of functioning across three domains (conceptual, social, and practical). DSM-5 provides diagnostic criteria that include deficits in intellectual functioning -such as reasoning, problem-solving, planning, abstract thinking, judgment, academic learning, and learning from experience – confirmed by both clinical assessment and individualized, standardized intelligence testing. The guidance in DSM-5 explains that while intellectual disability does not have a specific age requirement, the symptoms must begin during the developmental period, and the diagnosis is based on the severity of deficits in adaptive functioning.

With this guidance in mind, the undersigned gives no weight to Dr. Goff's diagnoses and conclusions regarding the claimant's mental limitations. The claimant told Dr. Goff that he graduated high school and did not repeat any grade levels or receive any special education services. He testified at the hearing that he attended Shelton State

Community College for two years and obtained certification as a diesel mechanic. He also testified that he could read and write well. The undersigned further notes that the claimant has a history of skilled work as a diesel mechanic as classified by the vocational expert. This work history supports the conclusion that regardless of his WAIS-IV scores, the claimant has demonstrated adaptive functioning at a much higher level than could reasonably be considered consistent with a diagnosis of borderline intellectual functioning.

* * *

The claimant reported that he has experienced seizures since he was fifteen years old and that they have gotten worse over time. He related that after a seizure, his head hurts and he is tired. However, the claimant told a consultative psychological examiner in July 2013 that his seizures had decreased since he started taking medications (Exhibit 23F), and he testified that he had only experienced two seizures in 2014.

He testified that he can no longer work as a mechanic because he cannot stand for a long time or lift heavy objects. He reported that he experienced fatigue as a side effect of his medication. However, he reported that on an average day he watches television and may take a walk. He also testified that he enjoys riding a four-wheeler about once a week and that he does some mechanic work "every now and then." He also admitted that he does some household chores, cooks sometimes, and goes to the grocery store to shop for groceries.

According to the medical evidence, the claimant did not experience any seizures from 2004 to 2010 (Exhibit 2F). However, he sought emergent care on March 8, 2011 and reported that he had experienced a seizure that morning (Exhibit 1F). Labwork indicated a sub-therapeutic level of Dilantin. Additionally, on March 22, 2011, the claimant told his neurologist, Alexandre B. Todorov, M.D., that he had experienced two seizures between February 20, 2011 and March 22, 2011 (assumedly one of which was the seizure evidenced in Exhibit 1F). Based on the medical evidence, the claimant suffered one seizure in 2011, but he reported one additional seizure for which he apparently did not seek any medical treatment.

As for 2012, the medical evidence documents that the claimant had a seizure in March 2012 and in April 2012 (Exhibits 10F and

11F). Both times he sought emergency care following the seizures, and on both occasions his Dilantin level was found to be significantly sub-therapeutic. On March 29, 2012, his Dilantin level was 5.5, and on April 28, 2012, it was less than 2.5. The claimant was diagnosed with medication non-compliance in connection with his treatment for seizure on April 28, 2012. Additionally, the claimant's wife reported to the claimant's medical providers that the claimant may have missed his evening dose of Dilantin prior to the April 28, 2012 seizure. The claimant sought emergent treatment for a seizure again on July 14, 2012 (Exhibit 13F). At that time, he also reported experiencing a seizure the week before. Thus, based on the medical evidence, the claimant sought emergent care for three seizures in 2012 and reported a fourth seizure for which he apparently did not seek any medical treatment.

Of note, the claimant and his wife saw Dr. Todorov in April 2012 and asked him to send a letter regarding his condition to the Administrative Law Judge (Exhibit 17F). The claimant's wife told Dr. Todorov that the claimant had experienced a number of seizures and that he went to the emergency room after each seizure. However, Dr. Todorov noted that the claimant did not bring his medications so that Dr. Todorov could determine if he was taking them correctly and he did not bring a seizure calendar so that Dr. Todorov could ascertain the frequency with which the claimant was having seizures. He indicated that he would be happy to write a letter indicating that the claimant had a seizure disorder, but that he did not have the information to discuss the claimant's medication compliance or the frequency of his seizures. Apparently, the claimant did not return to Dr. Todorov for further treatment after this discussion.

Looking at 2013, the claimant's mother reported to his primary care physician on January 7, 2013 that the claimant had experienced a seizure the week before (Exhibit 14F), but there are no emergency department records to support this. On May 3, 2013, the claimant saw Dr. Timberlake, a primary care physician, who noted that the claimant had a seizure earlier that day, but that he had only two to four seizures a year (Exhibit 25F). However, there are no emergency department records to evidence that the claimant sought emergency care for a seizure on May 3, 2013. There are emergency department records documenting treatment for a seizure on May 19, 2013 (Exhibit 26F). Also, the claimant told Dr. Emig that he had two more seizures after July

23, 2013 (Exhibit 27F), but he apparently did not seek emergency care for those seizures either.

With regard to 2014, the medical evidence documents that the claimant had two seizures on February 18, 2014 (Exhibit 28F). In fact, the second seizure was witnessed by emergency department personnel. This is the only seizure referenced in the medical evidence that occurred in 2014, and this is consistent with the claimant's report to Dr. Emig on August 25, 2014 that his most recent seizure was in February 2014 (Exhibit 33F). This is also generally consistent with the claimant's testimony at the December 2014 hearing that he had experienced two seizures in 2014.

In July 2014, Dr. Emig, a neurologist at Alabama Neurology and Sleep Medicine who has treated the claimant for his seizure disorder, completed a Medical Source Statement regarding the claimant (Exhibit 32F). Dr. Emig reported that the approximate frequency of the claimant's convulsive seizures was "a few times a year" and that the claimant's estimated degree of compliance with treatment was "satisfactory." He further reported that the claimant did not have any side effects from his medications. The undersigned gives Dr. Emig's July 2014 opinions good weight because they are consistent with his treatment records and the totality of the evidence.

In April 2013, Dr. Emig reported that the claimant suffered generalized seizures more than once a month and that his estimated degree of compliance with treatment was "satisfactory." The undersigned gives Dr. Emig's April 2013 opinion regarding the approximate frequency of the claimant's seizures little weight because it is not supported by the medical evidence of record.

In January 2013, Dr. Timberlake stated that the claimant was "completely and totally disabled to do gainful work now or in the future" (Exhibit 16F). In August 2014, Dr. Emig, M.D, stated: "Clearly the patient is disabled from his epilepsy as he is unlikely to be able to maintain employment" (Exhibit 33F). Medical sources often offer opinions about whether an individual who has applied for Title II or Title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions. Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner and can never be entitled to controlling weight or given special significance (SSR 96-Sp). The undersigned gives these opinions little weight

because they are not consistent with the totality of the evidence.

In December 2014, Perry Timberlake, M.D., of the Hale County Hospital Clinic, completed a Medical Source Statement regarding the claimant (Exhibit 34F). He opined that the claimant had the following residual functional capacity: He could sit for a total of two hours and stand or walk for a total of one hour during an eight-hour workday. He could lift and/or carry ten pounds occasionally and five pounds frequently. He could occasionally push and pull, perform gross or fine manipulation, bend or stoop, reach, operate motor vehicles, and work with or around hazardous machinery, but he could never climb stairs or ladders or balance. He would be absent from work more than three times a month due to his impairments or treatment. The undersigned gives Dr. Timberlake's opinion no weight. The medical records document that the claimant last saw Dr. Timberlake in May 2013, meaning that Dr. Timberlake had not seen the claimant in over a year at the time that he rendered his opinion. Additionally, his opinion is not consistent with the totality of the evidence. For example, the claimant himself does not allege that he has any limitations with regard to sitting or performing gross or fine manipulation. Moreover, when Dr. Timberlake last saw the claimant in May 2013, he noted that the claimant only had two to four seizures a year (Exhibit 25F) - a statement that is inconsistent with his opinion that the claimant would miss work more than three times a month due to his impairments.

In June 2011, Robert H. Heilpern, M.D., a State agency medical consultant, reviewed the record associated with the claimant's earlier application for benefits and opined that the claimant's seizure disorder was stable on Dilantin (Exhibit 5F). He noted that a CT of the claimant's head showed no acute abnormality and that the EEG's were normal. He further opined that the claimant had the following residual functional capacity: He had no exertional limitations. He could never climb ladders, ropes, or scaffolds, but had no other postural limitations. He had to avoid all exposure to hazards including commercial driving, hazardous machinery, unprotected heights, and large bodies of water. The undersigned gives Dr. Heilpern's opinion little weight because he did not adequately consider the claimant's subjective complaints associated with this seizure disorder. The undersigned finds that the claimant can perform light exertion work with seizure safety precautions in order to accommodate the claimant's seizure disorder.

As for the claimant's adjustment disorder with depressed mood, at the December 2014 hearing, the claimant testified that he felt depressed almost every day because of financial concerns. The claimant reported that his memory was "fair" and that he had some problems getting along with others, although he had difficulty explaining his specific problems with interacting with others. However, the claimant's Function Report, which was completed by his wife in September 2011, indicates that the claimant visited with friends and family on a daily basis and attended church and his stepchild's school activities (Exhibit 16E). His wife also reported that the claimant got along "very well" with authority figures and that he had never been fired or laid off from a job because of problems getting along with other people. The claimant reported on the Function Report that he completed in June 2011 that he had problems remembering things (Exhibit 8E). However, he also reported that he followed written and spoken instructions okay, and his wife reported on the Function Report that she completed for him in September 2011 that he had no problems with reading or watching television and that he did them "welll" (Exhibit 16E). She also reported that the claimant could pay attention well and that the claimant followed instructions well, although they sometimes had to be repeated. Additionally, the claimant denied any interests or hobbies on the Function Report.

According to the medical evidence, the claimant first complained of any mental health symptoms in February 2011 (Exhibit 2F). At that time, he told his neurologist that he was depressed, and Dr. Todorov prescribed Paxil. However, it is not clear that the claimant actually took this medication. In September 2011, he was hospitalized with a brief psychotic disorder (Exhibit 7F). However, he was improved at discharge. In October 2011, Dr. Todorov noted that the claimant was "not really depressed" (Exhibit 8F). In December 2011, the claimant told Terasa L. Davis, Psy. D., who completed a consultative psychological evaluation of the claimant, that he began experiencing multiple seizures on a daily basis a few month ago and that during this time he was also experiencing visual hallucinations and delusions. However, he reported that he had not experienced any more seizures, hallucinations, or delusions since he was hospitalized in September 2011 and his seizure medication was adjusted (Exhibit 9F). In January 2013, the claimant complained to Dr. Timberlake, a primary care physician, of anxiety (Exhibit l4F). His mother reported that he was mentally confused (Exhibit 14F). Dr. Timberlake diagnosed the claimant with

schizophrenia and referred him to the mental health center.

Based on the medical evidence of record, the claimant first saw a mental health professional on February 12, 2013 (Exhibit 18F). At that time, he was diagnosed by a psychiatrist (signature illegible) at West Alabama Mental Health with psychotic disorder, not otherwise specified. He was also assigned a Global Assessment of Functioning Scale Score of 60 at that time.

The GAF scale is a numeric scale used as axis V of a multi-axial assessment (Axis I through Axis V) in the 4th Edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM- IV") to rate the person's overall level of psychological, social, and occupational functioning (AM-13066, "Global Assessment of Functioning (GAF) Evidence in Disability Adjudication"). Each 10-point range (beginning at 0-10 and ending at 90-100) within the GAF Scale has two components: one that covers symptom severity, and a second covering functioning. If a person's symptom severity and level of functioning differ, the GAF rating reflects the lower rating.

A GAF score of 61-70 indicates that the individual has some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy or theft within the household), but that the individual is generally functioning pretty well with some meaningful interpersonal relationships. A GAF score of 51-60 indicates that the person has moderate symptoms (e.g., flat affect and circumstantial speech or occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends or conflicts with peers or co-workers). A GAF Score of 41-50 indicates that the individual has severe symptoms (e.g., suicidal ideation, severe obsessional rituals, or frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends or an inability to keep a job). A GAF score of 31-40 indicates that the individual has some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairments in several areas such as work or school, family relations, judgment, thinking, or mood (e.g., depressed, avoids friends, neglects family, and is unable to work).

The Commissioner of the Social Security Administration has stated that "[a]s with other opinion evidence, the extent to which

an adjudicator can rely on the GAF rating as a measure of impairment severity and mental functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise." Additionally, the Commissioner has stated that GAF scores are problematic because there is no way to standardize measurement and evaluation.

The undersigned gives the February 2013 GAF rating some weight because the assigning physician completed an intake assessment of the claimant and the rating is generally consistent with other evidence relating to this time period. However, I do not give it more weight because this was the first time that the physician evaluated the claimant and because of the problems with GAF scores identified by the Commissioner.

In May 2013, the claimant reported to his psychiatrist at West Alabama Mental Health that he was "doing good" with his medication (Exhibit 22F). The claimant participated in some individual therapy sessions from June 2013 to February 2014 (Exhibit 29F). He reported moderate progress managing his symptoms in June 2013 and that he was "doing okay" and was taking his medications only as needed in October 2013. He also reported decreased symptoms of psychosis in October 2013. In January 2014, he told his therapist that he did not feel that he needed any medication to treat his mental condition and that he was able to manage his symptoms with counseling. The claimant reported at the December 2014 hearing that he was not taking any medications to treat his mental health condition.

In July 2013, Dr. Goff completed a consultative psychological evaluation of the claimant at the request of the claimant's Representative (Exhibit 23F). The claimant told Dr. Goff that he got depressed and that he was easily upset. He reported that he thought the claimant was "somewhat depressed" and diagnosed him with depressive disorder, not otherwise specified.

In June 2011, Jerry Gragg, Psy. D., completed a consultative mental examination of the claimant at the request of Disability Determination Service in connection with an earlier application for disability benefits (Exhibit 3F). The claimant told Dr. Gragg that he graduated with a high school diploma and earned A's and B's in regular classes. The claimant also told Dr. Gragg that he quit his last job after six months because he was not permitted to drive

due to his epilepsy medications. The claimant told Dr. Gragg that his mood was "up and down" and that he had been concerned about "providing for his family. "He explained that he had been somewhat sad since he stopped working and reported lower levels of energy and having a little trouble getting out of bed in the morning. Upon mental status examination, the claimant was well oriented in all spheres, and no impairments in memory function were noted. His abstract reasoning capacity was fair, as were his judgment for hypothetical situations and his insight. His attention and concentration was good, and his fund of general information was consistent with his educational background and an intellectual level which was estimated to lie in the average range of general intelligence. No impairments of receptive or expressive language functioning were noted. His speech productivity was normal. He spoke in an expressive voice that was normal with respect to flow and was readily understood. No impairments of thought processes were noted either. The structure of his thoughts was logical, relevant, and goal-directed. Perceptual anomalies, such as auditory or visual hallucinations (hearing or seeing things that others do not hear or see) were denied. No delusional thought content was noted in his conversation, nor could any be elicited through direct questioning. He denied any inclination to engage in self-injurious behaviors or aggression against others. The claimant exhibited a normal motor-activity level. He made adequate eye contact throughout the evaluation. Other forms of non-verbal communication, such as mannerisms, gestures, and facial expressions, were considered to be normal and socially appropriate.

Dr. Gragg opined that the claimant was not suffering from any form of thought disorder, major affective disorder, significant anxiety disorder, or an appreciable personality disorder. Dr. Gragg's diagnostic impression was adjustment disorder with depressed mood. He opined that the claimant would be able to respond appropriately to supervision and that he had adequate social skills to relate to others. He also felt that the claimant had adequate intellectual functioning to be able to understand, remember, and carry out instructions and that he would be able to handle work-related stresses effectively. Dr. Gragg concluded: "In sum, there do not seem to be any intellectual or psychological features that would interfere with his ability to function in a work environment. In fact, he would probably benefit from obtaining a job as doing so may help him feel productive and lift his depressed mood regarding his inability to support his family." The

undersigned gives Dr. Gragg's opinions good weight because they are consistent with his examination findings and with the totality of the evidence.

In December 2011, Terasa Davis, Psy. D., completed a consultative mental examination of the claimant at the request of Disability Determination Service (Exhibit 9F). The claimant told Dr. Davis that he developed depression after the frequency of his seizures increased and he lost his job. He also reported anxiety over work, his wife being pregnant, and money problems. He further reported that he was having issues with severe depression when he stopped working, but that the depression had only occurred one to two times in the last six months. Upon mental status examination, Dr. Davis' diagnostic impression was psychotic disorder due to seizures in recent past and adjustment disorder with mixed anxiety and depressed mood. She noted that the claimant appeared to be able to understand instructions, but his ability to carry out instruction might be impaired due to his physical limitations. She also felt that his ability to recall instructions did not appear significantly impaired and that his ability to respond appropriately to co-workers and supervisors did not appear impaired. She opined that work stress was not likely to lead to further declines in his functioning because he really wanted to return to work and provide for his family. The undersigned gives Dr. Davis' opinions regarding the effects of claimant's mental impairment good weight because they are consistent with her examination findings and with the totality of the evidence.

In June 2011, Dr. Estock, a State agency psychological consultant, reviewed the record in connection with the claimant's earlier application for benefits and opined that the claimant had the following mental residual functional capacity: He could understand and remember simple instructions but not detailed ones. He could carry out simple instructions and sustain attention to routine/familiar tasks for extended periods. He could tolerate ordinary work pressures but should avoid quick decision-making, rapid changes, and multiple demands. He would benefit from regular rest breaks and a slowed pace but would still be able to maintain a work pace consistent with the mental demands of competitive level work. Contact with the public should be casual. Feedback should be supportive.

Claimant could adapt to infrequent, well-explained changes (Exhibit 6F).

In December 2011, Dr. Estock reviewed the record again in connection with the claimant's current applications for benefits (Exhibits 2A and 3A). He opined that the claimant's mental impairments resulted in a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and one or two repeated episodes of decompensation. He also opined that the claimant had the following mental residual functional capacity: He would be expected to understand, remember, and carry out short simple instructions and tasks but would likely have difficulty with more detailed tasks and instructions. He would be expected to maintain attention and concentration for two hours with all customary rest breaks. A well-spaced work environment would be best for maximum concentration. He would likely miss one to two days per month due to psychological symptoms. Contact with the public should be infrequent and non-intensive. Supervision should be tactful and constructive and non-threatening. Changes in the workplace should be infrequent and gradually introduced. The undersigned gives Dr. Estock's opinions little weight because they are not consistent with the totality of the evidence.

The record also contains a Third Party Function Report completed in May 2011 by the claimant's mother, Catherine Benison (Exhibit 5E). The undersigned has considered this evidence to show the severity of the claimant's impairments and how they affect his ability to function (SSR 06-3p). The undersigned gives this evidence only some weight because Ms. Benison seemed to indicate that she did not see her son often and answered "don't know" to numerous questions. Additionally, the undersigned gives this evidence only some weight because Ms. Benison is not an acceptable medical source and because of the potential for bias based on the personal relationship.

The record also contains a Third Party Function Report completed in September 2011 by the claimant's wife, Sharon Benison (Exhibit 17E). The undersigned has considered this evidence to show the

severity of the claimant's impairments and how they affect his ability to function (SSR 06-3p). The undersigned gives this evidence some weight because Mrs. Benison saw the claimant on a daily basis. However, the undersigned does not give this evidence great weight because Mrs. Benison is not an acceptable medical source and because of the potential for bias based on the personal relationship.

In sum, the residual functional capacity finding that the claimant can perform light exertion work with safety precautions with the additional finding that he will miss one day of work per quarter fully accommodates the claimant's seizure disorder and is supported by the medical evidence of record. The mental limitations in the residual functional capacity accommodate the claimant's mental health impairment. No further mental limitations are warranted in light of the claimant's testimony including his reported daily activities and the medical evidence which demonstrates that the claimant's symptoms improved significantly.

(Tr. 33-34, 37-44).

## V. DISCUSSION

Eligibility for DIB and SSI benefits requires that the claimant be disabled. 42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1)-(2). A claimant is disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be severe, making the claimant unable to do the claimant's previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-11. "Substantial gainful activity means work that … [i]nvolves doing significant and productive physical or mental duties [that] [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation in determining whether the claimant is disabled:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairment in the regulations; (4) if not, whether the claimant has the RFC to perform her past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Comm'r of Soc. Sec.,* 457 F. App'x 868, 870 (11th Cir. 2012) (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)(f); *Phillips v. Barnhart,* 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden of proving the first four steps, and if the claimant does so, the burden shifts to the Commissioner to prove the fifth step. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

If the claimant appeals an unfavorable ALJ decision, the reviewing court must determine whether the Commissioner's decision to deny benefits was "supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178 (11th Cir. 2011) (citations omitted); *see* 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel*, 631 F.3d at 1178 (citations omitted). "In determining whether substantial evidence exists, [the reviewing court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The reviewing court "may not decide the facts anew,

reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]."
*Id*. When a decision is supported by substantial evidence, the reviewing court
must affirm "[e]ven if [the court] find[s] that the evidence preponderates against
the Secretary's decision." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir.
1986).

As set forth above, Benison has asserted two grounds in support of his
argument that the Commissioner's decision to deny him benefits is in error. The
Court will address Benison's contentions in the order presented.

**A. ALJ Erred in Rejecting Medical Opinions**

Benison asserts that the ALJ erred in rejecting the opinions of Dr.
Timberlake, one of the treating physicians, and Dr. Emig, one of the treating
neurologists. The Commissioner asserts that the ALJ provided valid reasons for
the weight accorded the doctors' opinions, that those findings are supported by
substantial evidence, and that the ALJ's evaluation of their opinions is entitled to
deference.

The relevant social security regulations provide that medical opinions are
weighed by considering the following factors: 1) whether the source of the
opinion examined the claimant; 2) whether the source treated the claimant and, if
so, a) the length of the treatment relationship and the frequency of examination
and b) the nature and extent of the treatment relationship; 3) the supportability of
the opinion with relevant evidence and by explanations from the source; 4) the
consistency of the opinion with the record as a whole; 5) whether the opinion was
offered by a specialist about a medical issue related to his or her area of

specialty; and 6) any other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(1)-(6); *see also Nichols v. Comm'r, Soc. Sec. Admin.*, No. 16-11334, 2017 WL 526038, at * 5 (11th Cir. Feb. 8, 2017) (citing 20 C.F.R. §§ 404.1527(c), 416.927(c)) (stating that "[i]n determining how much weight to give a medical opinion, the ALJ considers such factors as the examining or treating relationship, whether the opinion is well-supported, whether the opinion is consistent with the record, and the doctor's specialization").

In the instant case, the ALJ provided an extensive review of the medical evidence in his Decision. Based on this extensive review of the records and testimony, the ALJ accorded "little weight" to Dr. Timberlake's opinion that Benison was "completely and totally disabled to do gainful work now or in the future" for several reasons. (Tr. 39). First, he found that, because the finding of whether a claimant is disabled from doing gainful work is an administrative finding that is reserved to the Commissioner, a doctor's opinion on that issue is not entitled to controlling weight or given special significance. (*Id*.). Moreover, the ALJ found, in this case, that this opinion rendered by Dr. Timberlake was not consistent with the totality of the evidence. (*Id*.).

The ALJ correctly noted that determination of whether a claimant is disabled from doing gainful work is an issue reserved to the Commissioner, and a doctor's opinion on that issue can be disregarded. *See Lowery v. Berryhill*, Civ. A. No. 4:16-cv-00913-AKK, 2017 WL 1491274, at *3 (N.D. Ala. Apr. 26, 2017) (citing *Pate v. Comm'r, Soc. Sec. Admin.*, 678 F. App'x 833, 834 (11th Cir. 2017) ("the determination of whether an individual is disabled is reserved to the

Commissioner, and no special significance will be given to an opinion on issues reserved to the Commissioner.")). In addition, a physician's opinion as to a claimant's ability to work is not entitled to recognition from an ALJ if the opinion is not supported by or consistent with the totality of the evidence. *Id*.

In December of 2014, Dr. Timberlake completed a Medical Source Statement in which he offered an opinion concerning Benison's residual functional capacity. (Tr. 39). The ALJ gave no weight to that opinion. (*Id*.). The ALJ noted that the medical records reflected that Dr. Timberlake had not seen Benison in over a year at the time he completed the Medical Source Statement. He also found that Dr. Timberlake's opinion was not consistent with the totality of the evidence. For example, as noted by the ALJ, although Benison never alleged that he had any limitations in sitting or performing gross or fine manipulation, Dr. Timberlake opined that he could sit for only a total of two hours during an eight-hour work day and that he could only occasionally perform gross or fine manipulation. (*Id*.).  Also, Dr. Timberlake's records reflected that, when he last saw Benison in May of 2013, he only had two to four seizures per year, yet he opined in the Medical Source Statement that Benison would be absent from work more than three times per month due to his impairment. (*Id*.).

"In assessing whether a claimant is disabled, an ALJ must consider the medical opinions in a case record *together with the rest of the relevant evidence received*." *Chambers v. Comm'r of Soc. Sec.*, 662 F. App'x 869, 870 (11th Cir. 2016) (citing 20 C.F.R. § 404.1527(b)) (emphasis added). The ALJ is to consider the claimant's daily activities when evaluating the symptoms and severity of an

impairment. *Id.* at 871 (citing 20 C.F.R. § 404.1529(c)(3)(i)). "[T]he more consistent an opinion is with the record as a whole, the more weight the ALJ will give to that opinion." *Id.* (citing 20 C.F.R. 404.1527(c)(4)). Although the opinions of treating physicians are generally entitled to substantial or considerable weight, the ALJ does not have to give a treating physician's opinion considerable weight if good cause is shown to the contrary. *See Phillips v. Barnhart,* 357 F.3d 1232, 1240 (11th Cir. 2004). The Eleventh Circuit "has concluded 'good cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* at 1240-41. Also, if the claimant's own testimony regarding the claimant's daily activities contradicts the consulting physician's opinion, the ALJ's decision not to give the physician's opinion considerable weight is not in error. *See Chambers*, 662 F. App'x at 872. Indeed, "an ALJ may reject any medical opinion if the evidence supports a contrary finding." *Nichols,* 2017 WL 526038, at *5 (citing *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985)). In this case, substantial evidence supports the ALJ's finding that Dr. Timberlake's opinions that were expressed in the Medical Source Statement were not in line with Benison's own testimony, Dr. Timberlake's own reports, or the record as a whole.

Benison alleges that the ALJ erred by impermissibly rejecting Dr. Emig's opinion regarding the frequency of his seizures based on there being no medical evidence to support this frequency because he did not go to the Emergency Room every time he had a seizure. (Doc. 14 at p. 7). Contrary to Benison's

contention that the ALJ "rejected" Dr. Emig's opinions regarding the frequency of his seizure, the ALJ's Decision reflects that he accorded good weight to Dr. Emig's opinions in July of 2014 because they were consistent with his treatment records and the totality of the evidence and he accorded "little weight" to Dr. Emig's April 2013 opinion that Benison suffered generalized seizures more than once a month because that opinion was not supported by the medical evidence of record. (Tr. 39). With regard to Benison's seizures in 2013, the ALJ noted that Benison's mother reported that he suffered one the week before January 7, 2013, but that there were no emergency department records to support that report; that he had reported to Dr. Timberlake on May 3, 2013 that he had a seizure earlier that day, but there were no emergency department records on that date either; that there were emergency department records documenting treatment for a seizure on May 19, 2013; and that Benison told Dr. Emig that he had two seizures after July of 2013, for which he did not seek emergency treatment. (Tr. 38). Assuming that these specific reports are accurate, he suffered far fewer seizures than once a month.[3] Also, Dr. Timberlake's records from 2013 reflected that Benison had two to four seizures per year. (*Id.*). Accordingly, there is substantial evidence in the record to support the ALJ's conclusion that Dr. Emig's opinion as to the frequency of Benison's seizures in 2013 was entitled to little weight as it was contrary to the totality of the evidence.

---

[3] Although there is a mention in Dr. Emig's notes that Benison reported that he can have a few seizures a month (Tr. 793-94), such a statement was not objectively supported by the record and the ALJ found that Benison's subjective statements were not fully credible (Tr. 37, 32-44), a finding that Benison did not challenge.

**B. ALJ Erred in Failing to Assign Weight to Medical Opinions**

Benison alleges that the ALJ erred by failing to assign weight to the opinions of Dr. Goff, an examining psychologist, and Dr. Todorov, a treating neurologist. (Doc. 14 at p. 7).

Dr. Goff performed a consultative examination of Benison, at his attorney's request, on July 23, 2013. (Tr. 747). Dr. Goff acknowledged that he had very sparse records to review and had, in fact, only received and reviewed the March 27, 2013 ALJ decision. (*Id*.). Based on a variety of tests given during the examination and the brief history given by Benison, Dr. Goff opined that Benison appeared to "be functioning within the borderline range of psychometric intelligence," had borderline memory skills, and was suffering from depression. (Tr. 752). He further opined that "there are no indications that [Benison] is mentally retarded but his borderline intellectual functioning does represent an impediment to vocational activity in my view." (*Id.*). Based on his single examination of Benison and no review of the many medical records of other treating physicians, Dr. Goff opined that Benison had marked limitations, which was defined as "a substantial loss in the ability to effectively function," in the ability to carry out detailed or complex instructions, to remember detailed or complex instructions, to respond to customary work pressures, to deal with changes in a routine work setting, to use judgment in detailed or complex work-related decisions, and to maintain attention, concentration or pace for periods of at least two hours. (Tr. 753).

After reviewing the above findings of Dr. Goff, the ALJ discussed the

Diagnostic and Statistical Manual of Mental Disorders and the guidance it gives to establish a diagnosis of intellectual disability, with particular attention on the instruction that IQ alone is insufficient to establish intellectual disability and that in making such a diagnosis clinicians must examine an individual's overall level of functioning across the three domains – conceptual, social, and practical. (Tr. 34). He also noted that according to the DSM-5, the diagnosis must be based on the severity of deficits in adaptive functioning. (*Id.*).

Benison asserts that the ALJ failed to indicate the weight given to Dr. Goff's opinions; however, the ALJ specifically stated in the Decision that, based upon the foregoing guidance from the DSM-5 and the totality of evidence in the record, he gave no weight to Dr. Goff's diagnoses and conclusions regarding [Benison's] mental limitations. (*Id.*). The ALJ's decision to disregard Dr. Goff's opinions was specifically based on the record evidence that showed that Benison graduated high school and did not repeat any grade levels or receive any special education services; that he attended Shelton State Community College for two years and obtained certification as a diesel mechanic; that he testified that he can read and write well; and that he has a history of skilled work as a diesel mechanic. The ALJ found that his "work history supports the conclusion that regardless of his WAIS-IV scores, [Benison] has demonstrated adaptive functioning at a much higher level than could reasonably be considered consistent with a diagnosis of borderline intellectual functioning." (*Id.*). The ALJ reviewed the opinion of Dr. Goff and explained, by citing to record evidence, his reasons for giving it no weight. This Court finds that the ALJ's decision is

supported by substantial evidence.

Benison also alleges that the ALJ erred by not setting forth the weight he accorded to Dr. Todorov's opinions. Specifically, he claims that Dr. Todorov recommended that he file for disability benefits[4] and that the "ALJ failed to indicate what weight he gave to the treating neurologist's opinion, or the reasons for that weight." (Doc. 14 at p. 8). The ALJ did include a review of Dr. Todorov's April 2012 records that reflected that Benison had requested that Dr. Todorov offer an opinion as to the frequency of his seizures and as to his compliance with his medications. (Tr. 38). The ALJ specifically took note of the fact that Dr. Todorov "indicated that he would be happy to write a letter indicating that [Benison] had a seizure disorder, but that he did not have the information to discuss [Benison's] medication compliance or the frequency of his seizures." (*Id*.). The ALJ further noted that Benison apparently did not return to Dr. Todorov for further treatment after that discussion. The ALJ did, thus, address Dr. Todorov's statement, but based upon the fact that the ALJ did provide the weight

_____

[4] On October 6, 2011, approximately 3 weeks **after** Benison filed the instant claim for benefits, Dr. Todorov stated in his medical notes: "I doubt that [Benison] is taking Depakote [the medication prescribed to treat his seizures] the right way. He needs to file for disability." (Tr. 583). In his brief, Benison failed to explain his grounds for arguing that this statement was actually an opinion as to his medical condition or otherwise worthy of comment. Even presuming that Benison's argument is based on a reading of this note as being Dr. Todorov's opinion that he is disabled, the weight to be accorded it would be no different than similar opinions rendered by Dr. Timberlake and Dr. Emig. As noted herein, the ALJ explained in his Decision that medical sources' opinions about whether a claimant is "disabled" or "unable to work" or similar statements can never be entitled to controlling weight or given special significance because that is an issue reserved to the Commissioner. (Tr. 39). The ALJ stated that he gave those opinions little weight because they were not consistent with the totality of the evidence. (*Id*.).

given to each of the other physician's medical opinions, it seems that he did not consider Dr.Todorov's statements to be opinions upon which he needed to accord weight. Medical opinions upon which the ALJ must state the weight given "are statements from physicians and psychologists or other acceptable medical sources that reflect judgment about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." *Winschel*, 631 F.3d at 1178-79 (quoting 20 C.F.R. §§ 404.1527(a)(2), 416.927 (a)(2)). This Court agrees that Dr. Todorov's statements did not constitute opinions of this type. However, even if these statements in Dr. Todorov's records should have been specifically given weight by the ALJ, such error was harmless in that the statements support the Commissioner's position as much as, if not more than, Benison's and do not offer any additional information than that offered by other physicians. *See Caldwell v. Barnhart*, 261 F. App'x 188, 190 (11th Cir. 2008) (holding that when "an incorrect application of the regulations results in harmless error because the correct application would not contradict the ALJ's ultimate findings, the ALJ's decision will stand"); *Wright v. Barnhart*, 153 F. App'x 678, 684 (11th Cir. 2005) (holding that "although the ALJ did not explicitly sate what weight he afforded the opinions of [several physicians], none of their opinions directly contradicted the ALJ's findings, and, therefore, any error regarding their opinions is harmless").

## CONCLUSION

It is well-established that it is not this Court's place to reweigh the evidence or substitute its judgment for that of the Commissioner. This Court is limited to a determination of whether the ALJ's decision is supported by substantial evidence and based on proper legal standards. The Court finds that the ALJ's Decision that Benison is not entitled to benefits is supported by substantial evidence and based on proper legal standards. Accordingly, it is **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff benefits be **AFFIRMED**.

**DONE** and **ORDERED** this the **31st** day of **July, 2017**.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**